## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| NATASHA ANDERSON-SONDESKY : | |
| 49 Spindletop Lane : | |
| Willingboro, NJ 08046 : | CIVIL ACTION |
| : | |
| Plaintiff, : | No. |
| v. : | |
| : | |
| CONDUENT TRANSPORTATION : | |
| SOLUTIONS, INC. : | **JURY TRIAL DEMANDED** |
| 100 Campus Drive, Ste. 200 : | |
| Florham Park, NJ 07932 : | |
| and : | |
| CONDUENT INCORPORATED : | |
| 100 Campus Drive, Ste. 200 : | |
| Florham Park, NJ 07932 : | |
| : | |
| Defendants. : | |

## CIVIL ACTION COMPLAINT

Natasha Anderson-Sondesky, (*hereinafter* referred to as "Plaintiff," unless indicated otherwise), by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.     This action has been initiated by Plaintiff against Defendants for violations of the Family and Medical Leave Act ("FMLA - 29 U.S.C. §§ 2601 *et seq*.), the New Jersey Law Against Discrimination ("NJ LAD" - N.J.S.A. §§ 10:5-1, *et. seq*.), and 42 U.S.C. § 1981. Plaintiff asserts, *inter alia*, that she was unlawfully discriminated against, retaliated against, and terminated from her employment (among other violations). As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.     This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks

1

redress of such federal statutes. There is supplemental jurisdiction over Plaintiff's state law claims herein, as they arise out of the same common nucleus of operative facts as her federal claims.

3.    This Court may properly maintain personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction in order to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.

4.    Pursuant to 28 U.S.C. §1391(b)(1) and (b)(2), venue is properly laid in this district because a substantial part of the events or omissions giving rise to the claims set forth herein occurred in this judicial district, in addition, venue is properly laid in this district because Defendants are deemed to reside where they are subject to personal jurisdiction, rendering Defendants residents of the District of New Jersey for this action.

<u>**PARTIES**</u>

5.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6.    Plaintiff is an adult individual, with an address as set forth in the caption.

7.    Conduent Transportation Solutions, Inc. ("Defendant CTS") and Conduent Incorporated ("Defendant CI") are properly considered Plaintiff's single, joint and/or integrated employer(s). Defendants CTS and CI are hereinafter collectively referred to as "Defendants."

8.    Plaintiff was paid through Defendant CTS, had benefits processed through Defendant CTS, and tax (and W-2) information was provided to Plaintiff through Defendant CTS. Plaintiff's human resources matters / complaints / investigations were processed by human resources personnel of Defendant CI, Defendant CI advertises for Defendant CTS, there is joint

management oversight over both operations, and Defendants are both located within the same physical headquarters (in Florham Park, New Jersey).

9.      Defendants operate as a collective enterprise formed between 2016 to 2017 as a divestiture from Xerox. Defendants offer and sell digital platforms for businesses and governments and maintain over 50,000 employees in more than 30 countries combined.

10.      At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

**FACTUAL BACKGROUND**

11.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

12.      Plaintiff was hired in or about 2014, and she had begun working for Xerox (and its affiliated entities). As of mid-2016, Xerox announced it would be spinning off its Xerox Business Services Division into a wholly separate corporation. Shortly thereafter, Defendants were established following formal separation from Xerox.

13.      Within the first few years of Plaintiff's employment with Defendants, she was considered to physically work from Philadelphia, Pennsylvania. However, from early 2016 until termination (in August of 2020), Plaintiff solely worked for Defendants in New Jersey.

14.      Jurisdiction for filing of the instant lawsuit clearly exists in New Jersey. Although the management employee who discriminated and retaliated against Plaintiff (as outlined *supra*) was deemed based in Philadelphia, all relevant factors weigh in favor of this lawsuit taking place in New Jersey. In particular:

> (1) Defendants are both headquartered, operated from, and based within New Jersey (at Florham Park), as are the bulk over their executive management;

3

(2) Plaintiff resides in New Jersey, and she has done so for the entire duration of her employment with Defendants;

(3) During her last approximate 4 years of employment, Plaintiff **solely** worked within New Jersey remotely from 49 Spindletop Lane, Willingboro, New Jersey 08046; and

(4) With the exception of her immediate manager (based in Philadelphia), the relevant human resources personnel Plaintiff dealt with (and her immediate manager's supervisor) work in different states spanning much of the Eastern United States.

15.     From hire through in or about May of 2019, Plaintiff was supervised by James DiCaprio. As of May 2019, DiCaprio ceased working as Plaintiff's supervisor.

16.     As of in or about June of 2019, Plaintiff began being supervised by a new manager, John Wharton. From June of 2019 through December of 2019, Wharton was referred to as a Director of Operations. From December 2019 through Plaintiff's termination (in August of 2020), Wharton was referred to as a Director of Delivery.

17.     During Plaintiff's employment under DiCaprio, Plaintiff had worked for approximately 3 years exclusively from her residence and remotely (in New Jersey). This was a medical accommodation Plaintiff had been provided.

18.     Plaintiff has been a disabled woman for many years. She has and continues to utilize a wheelchair, and she suffers from: (a) CFIDS and migraines; (b) Fibromyalgia; (c) Lupus; and (d) other medical and health complications. Plaintiff has a long history of medical treatment and medication regimens. Prior to working under Wharton, Plaintiff was ensured the perpetual and indefinite medical accommodation of telecommuting.

19.     Plaintiff had been employed by Defendants as a Client Services Senior Manager. Plaintiff was able to perform her job in an exceptional manner, and she was in all respects an

exemplary employee during her entire tenure. Plaintiff worked very hard, often worked at least 50-60 hours per week, was very knowledgeable, and consistently met timelines and expectations.

20.    Defendants' elevation of Wharton to management over Plaintiff and approximately 30-plus other employees came as a surprise to his subordinate staff (shortly after his hire). This was not because of Wharton his qualifications, but rather, because of how he conducted himself in ***an exceptionally inappropriate manner*** for working in senior-level management for a sophisticated international organization.

21.    As of the spring of 2020, Plaintiff was compelled to lodge serious discrimination complaints against Wharton. In conjunction with and as a result of Plaintiff's complaints, she was informed human resources management were investigating Wharton. Such human resources personnel spanned different states including as far as North Carolina. The investigation prompted by Plaintiff's complaints ended, to her knowledge, in late May or early June 2020 (resulting in Wharton being placed on "probation"). Plaintiff's concerns had been validated and corroborated by numerous witnesses, although Defendants failed to abide by purported zero-tolerance policies of discrimination in the workplace.

22.    Wharton was an extremely crude, reckless, and discriminatory manager who had no regard for what he said or did in the workplace. He had no regard for personnel policies, corporate norms, handbook expectations or directives, and engaged in unlawful harassment and discrimination.

23.    From a categorical standpoint as to the concerns Plaintiff had and raised in the spring of 2020 with human resources and management of Defendants, such issues included: (1) disability discrimination; (2) racial discrimination; and (3) inappropriate sexual comments.

### [1] Disability / FMLA Discrimination

24.     Wharton engaged in numerous acts of discrimination related to Plaintiff's health,

including but not limited to:

> (A) Regularly discussing Plaintiff's health and FMLA needs, expressing disgust at Plaintiff being unable to physically work from the premises or need for medical accommodations, and being critical of Plaintiff's health limitations verbally (to Plaintiff and others in the workplace); and

> (B) Suggesting to Plaintiff that she isn't in the workplace as if it were a concern, repeatedly attempting to raise telecommuting policies with Plaintiff as if she were taking advantage of flexibility, and by questioning her ability to accomplish certain things not being in the office.

### [2] Racial Discrimination

25.     Wharton engaged in numerous acts of discrimination related to race in the

workplace, including but not limited to:

> (A) Knowingly requiring African-American and black employees to physically work during the COVID pandemic and directed Plaintiff to find some work for non-black employees Wharton was permitting to stay home. When Plaintiff questioned to equity of this as there appeared to be a clear racial disparity, Wharton's response was "white privilege;" and

> (B) Referring to another coworker's son who came to work as "some black kid" who showed up, among other noticeable differences in treatment based upon race (affecting the terms and conditions of employment of Plaintiff and others).

26.     Plaintiff was particularly offended as an African-American female herself, who

identifies as black based upon her dark complexion (although she has some Hispanic origin as

well).

### [3] Inappropriate Sexual Comments / Gestures

27.     Wharton engaged in numerous acts of inappropriate sexual commentary such as:

(a) suggesting he go to Plaintiff's house (unrelated to business); (b) questioning or perpetuating

rumors about Plaintiff being in relations with her old boss or Wharton; (c) telling another coworker he would remember if she was under him last night; and (d) other inappropriate sexual innuendo.

<u>**Plaintiff's Retaliatory Termination**</u>

28.     Wharton was so unprofessional, he: (a) openly discussed other employee personnel issues; (b) used profane language; (c) violated code of conduct policies within Defendant; (d) dispensed with Plaintiff's annual performance evaluation while he was driving in his vehicle for a matter of minutes only to quickly start talking about personal (unrelated) matters; and (e) had no reservation or reflection about engaging in the aforesaid types of discrimination in a corporate work environment.

29. As a result of Plaintiff's complaints of discrimination, numerous current and/or former employees of Defendants confirmed discriminatory treatment towards Plaintiff and identified their own discriminatory experiences by Wharton. These confirmations took place when interviewed as part of the investigation concerning Plaintiff's complaints against Wharton.

30.     Wharton was of course aware of Plaintiff's allegations against him because; (1) Defendants' human resources identified they were going to raise and question him about Plaintiff's concerns; (2) Plaintiff had herself expressed concerns directly to Wharton; and (3) Wharton was placed on "probation" effective in or about June of 2020 as a direct and proximate result of Plaintiff's discrimination allegations against him (which were founded). *Upon information and belief, the probationary period was a mere slap on the wrist of 60 days for probation (despite supposed zero tolerance for workplace discrimination).*

31.     Plaintiff was then abruptly informed of her termination from employment under the guise of a reduction in force and/or job elimination on or about August 11, 2020. This was right around the time in which Wharton's probation would have ended or was about to end.

32.     Plaintiff's termination was ridiculous, absurd, pretextual, and retaliatory for reasons which included but are not limited to:

(1) While Plaintiff has no intention of questioning Defendants' ordinary business judgment, she did perform a critical, integral and necessary role for Defendants;

(2) Plaintiff's termination was in very close temporal proximity to: (a) her verbal complaints of discriminatory treatment; (b) an HR investigation in concerns of discriminatory treatment by Wharton; and (c) shortly after Wharton received discipline for discrimination in the workplace;

(3) Plaintiff's termination was so abrupt, she was asked to wind down her work for several weeks after notification of job elimination, to help transition duties, passwords and information, among other functions. This is inconsistent with other people in prior years being reduced or eliminated who were generally terminated on the same day of notification;

(4) Despite not being entitled to severance per a specific policy and despite Defendants not offering severance to all other people in prior years affected by job eliminations or reductions in force, Plaintiff was offered severance in exchange for her signing a waiver of discrimination and retaliation legal rights. This is clear evidence of pretext and retaliation;[1] and

(5) Prior to Plaintiff's complaints of discrimination and a heightened investigation into Wharton, Wharton had discussed objectives and goals for Plaintiff that were significantly beyond the month of August 2020 (both in discussion and in his very cursory performance-review discussion).

---

[1] *See Staffieri v. Northwestern Human Servs*., 2013 U.S. Dist. LEXIS 72115 at **14-15 (E.D. Pa. 2013)(an employer who offered severance at the time of termination when policies did not require upon condition of waiving claim supported finding of pretext among other facts); *Bartlett v. NIBCO Inc*., 2011 U.S. Dist. LEXIS 28072 (N.D. Ind. 2011)(finding that a  severance agreement offered contemporaneously to when the employee was terminated was "probative on the issue of whether NIBCO's motive for terminating Bartlett was [false]."); *EEOC v. Republic Servs., Inc*., 640 F. Supp. 2d 1267 (D. Nev. 2009)(denying summary judgment and considering as evidence in wrongful termination case that a company would offer severance when an employee is supposedly terminated in a manner that doesn't warrant severance per an explicit company policy); *Karl v. City of Mountlake Terrace*, 2011 U.S. Dist. LEXIS 59085 (W.D. Wash. 2011)(severance agreements are admissible in retaliation claims when made contemporaneous to termination, as they are not governed by Fed.R.Evid. 408); *Brandy v. Maxim Healthcare Servs., Inc*., 2012 WL 5268365, at *2 (N.D. Ind. 2012)(holding that severance agreements offered at the time of termination do not fall under Rule 408 because they are offered before a dispute arises, regardless if the employer "anticipated the severance agreement curtailing any potential future litigation.").

33.     Plaintiff's termination also closely followed: (a) disclosures of an anticipated surgery to take place in September of 2020; (b) her discussions about FMLA and recertification of FMLA needs; and (c) concerns about scrutiny for her not physically working in Defendant's Philadelphia location (and wholly telecommuting).

34.     In sum, there is simply no question that Plaintiff was terminated for discriminatory and retaliatory reasons.[2]

**Count I**
**Violations of the Family and Medical Leave Act ("FMLA")**
**(Interference & Retaliation)**

35.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

36.     Plaintiff was at all times relevant an eligible employee under the FMLA for leave in each year of her employment.

37.     Plaintiff provided relevant, requested, and necessary medical information to Defendants. As a result, Plaintiff was deemed FMLA eligible by Defendant, as she met all criteria. Plaintiff was approved for intermittent FMLA usage in 2018 and 2019, and she sought recertification of FMLA usage in 2020.

38.     Plaintiff had her FMLA rights violated through interference, discrimination, and retaliation by *inter alia*: (1) being continually discouraged from using FMLA directly; (2) being dissuaded from use of FMLA though continued discriminatory comments about or concerning Plaintiff; (3) being terminated to prevent her from using FMLA further; (4) being terminated for

---

[2] This lawsuit is only intended to give examples of the types of discrimination Plaintiff or others experienced for the purposes of notice pleading. Nothing in this Complaint is intended to infer or state that examples provided are intended to be all inclusive.

requesting FMLA; and (5) being terminated for expressing mistreatment to Wharton and Defendants on account of her using FMLA.

39.     These actions as aforesaid constitute interference, discrimination and retaliation prohibited by the FMLA.

## Count II
## Violations of 42 U.S.C. § 1981
**(Discrimination & Retaliation)**

40.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

41.     Wharton is a non-black male was openly discrimination, even stating "white privilege" in response to his intentional actions in the workplace based upon race. He demonstrated that he had no reservation in taking actions in a workplace based upon racial criteria.

42.     Plaintiff was treated differently in many respects on account of her race while employed. Plaintiff's termination due to her race or her complaints of racial discrimination therefore constitute violations of 42 U.S.C. § 1981.

## Count III
## Violations of the New Jersey Law Against Discrimination ("NJ LAD")
**(Discrimination & Retaliation)**

43.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

44.     Plaintiff was terminated by Defendants because:

(1) Of her actual, known, record-of, and perceived health problems, all of which Defendants and their management were aware of during Plaintiff's employment;

(2) Of her requested medical accommodations, such as continued work from home, remotely and/or by telecommuting and for use of intermittent FMLA time (also another type of medical accommodation); and

(3) Of her complaints of discriminatory treatment due to her health and/or need for accommodations.

45.     These actions constitute discrimination and retaliation violations of the NJ LAD.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.     Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

B.     Plaintiff is to be awarded punitive and/or liquidated damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

C.     Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

D.     Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

E.     Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: October 9, 2020